******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# BRANDON BELLAMY *v.* COMMISSIONER OF CORRECTION
## (AC 47162)

Suarez, Wilson and Pellegrino, Js.

*Syllabus*

The petitioner, who previously had been convicted, after a jury trial, of murder and other crimes, appealed following the granting of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. The petitioner claimed, inter alia, that the court improperly concluded that his criminal trial counsel, C, did not provide ineffective assistance in deciding not to consult with and to call an expert witness to testify about the weaknesses in the identification of the petitioner by D, the only witness at the shooting scene. *Held*:

The habeas court correctly determined that C did not perform deficiently by not consulting with and presenting the testimony of an expert witness on eyewitness identification, as the law in effect at the time of the petitioner's criminal trial generally disfavored the admission of such testimony, and C's decision was a reasonable exercise of professional judgment, as he explored substantially the same areas during his cross-examination of D as an expert would have recommended.

The petitioner failed to establish that C rendered deficient performance in declining to object to the trial court's jury instructions on eyewitness identification, as the petitioner lacked evidence to support his claim, the jury was given instructions two different times on the issue of identification, which, read as a whole, were correct, sufficient to guide the jury and consistent with controlling decisional law on the issue at the time of the petitioner's trial, and the petitioner's claim was speculative in that he did not establish a reasonable likelihood that the court would have delivered alternative instructions, had C offered them, or that those instructions would have led to a different result at trial.

The habeas court properly concluded that C did not render ineffective assistance by failing to investigate and present a third-party culpability defense as to B, who allegedly had used the gun involved in the shooting in a prior incident, as C's decision constituted sound trial strategy in light of his inability to obtain sufficient evidence connecting a third party to the shooting, and the petitioner failed to demonstrate that he was prejudiced by C's actions, as he did not establish a reasonable likelihood that a third-party culpability defense as to B would have led to a different result at trial.

The habeas court correctly determined that the petitioner failed to establish that C rendered deficient performance by not calling witnesses to refute the state's evidence of motive, as C's decision not to do so was made on the basis of strategic reasons that were objectively reasonable, as was his decision not to attack the testimony of a witness who had implicated the petitioner in an altercation with the victims that preceded the shooting but who also denied having previously identified the petitioner as the shooter.

Argued September 8, 2025—officially released August 11, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the petition was withdrawn in part; thereafter, the case was tried to the court, *Newson, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed*.

*James B. Streeto*, senior assistant public defender, for the appellant (petitioner).

*Rebecca Z. Oestreicher*, special deputy assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Christopher A. Alexy*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SUAREZ, J. The petitioner, Brandon Bellamy, appeals, following the granting of his petition for certification to appeal, from the judgment of the habeas court denying his second amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly failed to conclude that his criminal trial counsel had provided ineffective assistance by failing (1) to consult with or call an expert witness on eyewitness identification, (2) to object to the jury instructions provided by the trial court on eyewitness identification, (3) to investigate or present a defense of third-party culpability, and (4) to investigate or call witnesses who could have refuted the state's evidence on motive. We disagree and, accordingly, affirm the judgment of the habeas court.

The following facts and procedural history, as reflected in the record or as set forth in the habeas court's memorandum of decision, are relevant to this appeal. Following a jury trial, the petitioner was convicted of two counts of the crime of murder in violation of General Statutes § 53a-54a (a), one count of the crime of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), one count of the crime of criminal possession of a pistol

in violation of General Statutes § 53a-217c (a), and one count of the crime of carrying a pistol without a permit in violation of General Statutes § 29-35. On January 7, 2011, the petitioner received a total effective sentence of 100 years of incarceration.

This court previously set forth the following facts pertaining to the petitioner's criminal conviction, as reasonably could have been found by the jury. "In 2008, two of the victims, Christopher Duncan and Justin Davis, lived together with Duncan's girlfriend, D,[1] in an apartment on the second and third floors of a house located at 124 County Street in New Haven. At times, the third victim, William Burruss, also stayed at the same apartment. On April 18, 2008, Duncan, Davis and Burruss drove to Gotham City, a New Haven nightclub. The [petitioner], with whom the victims were acquainted, also attended Gotham City that night.

"Sometime during that evening, an altercation occurred between Burruss and the [petitioner]; the two men pushed each other back and forth for approximately three or four minutes until club security broke up the fight. Following the incident, the three victims stayed at the club until it closed at approximately 3 a.m. without further interaction with the [petitioner]. The victims left the club and, after dropping off another friend, drove back to County Street, listening to loud music on the way. Because the street was dark, the men drove past the house where they lived with the high beams activated to ensure that no one was waiting for them. Seeing no one, they turned around and parked in front of the house. Exiting the car, Duncan dropped something and stopped to pick it up, such that he was behind the others as they approached the house.

"Upon coming to the driveway of the house, the victims heard a male voice from the side of the house saying, 'What up, now?' A man in a hooded sweatshirt ran out

---

[1] Consistent with this court's decision in the petitioner's direct appeal, we decline to identify D by her full name in order to protect her privacy interests. See *State* v. *Bellamy*, 149 Conn. App. 665, 667 n.1, 89 A.3d 927 (2014), aff'd, 323 Conn. 400, 147 A.3d 655 (2016).

from the shadows, firing several gunshots at the victims. Burruss was shot and fell to the ground. Duncan and Davis looked at each other and ran off in opposite directions. Duncan ran toward Goffe Street. He was shot in the arm and fell to the ground. When he jumped back up, he was shot again through the back. He continued to run, and when he reached the nearby street he flagged down a driver, who brought him to a hospital.

"D, who was waiting for the victims at the house, had heard the loud music from the car and was coming down from the third floor to open the front door when she heard more than fifteen gunshots from the street. She ran into a bedroom on the second floor of the house and looked out the front window to see what was happening below. She saw a body lying motionless on the sidewalk in front of the house. Farther out into the street, she saw a man facing in the direction of Goffe Street. When the man turned his head, D recognized him as the [petitioner]. She was unable to see whether he was carrying a gun. After a few seconds, the [petitioner] ran off.

"D went downstairs and exited the house, where she found Davis lying on the ground by the stairs to the house. After retrieving her cell phone from the apartment, she went back outside, where she saw Burruss' body. She then called emergency dispatch. The police arrived on the scene at approximately 4 a.m. Burruss and Davis were taken to nearby hospitals, where they both were pronounced dead from multiple gunshot wounds.

"The crime scene investigators swept the scene for evidence relating to the shooting. Twenty-two nine millimeter cartridge casings were recovered from the scene, and it was determined that all had been fired from the same weapon, most likely a Glock semiautomatic pistol. The weapon was never recovered. No fingerprint or DNA evidence recovered by the police tied the [petitioner] to the scene." (Footnote altered.) *State* v. *Bellamy*, 149 Conn. App. 665, 667–69, 89 A.3d 927 (2014), aff'd, 323 Conn. 400, 147 A.3d 655 (2016).

At the petitioner's criminal trial, "the critical issue . . . was the identity of the shooter. The state's primary evidence establishing the [petitioner] as the shooter was the testimony of D. At trial, the defense pursued several strategies for discrediting D's testimony. This included noting the circumstances of her identification. When the police initially interviewed D on the night of the shooting in April, 2008, she denied having seen anyone responsible for the crime. It was not until August, 2010, after having moved out of state, that she communicated with the Office of the State's Attorney and told an inspector what she had seen that night. She explained her initial hesitance in revealing the identity of the shooter as being based on fear that the [petitioner] would retaliate against her. The defense also highlighted the conditions under which D had witnessed the events in question, including the lighting, the distance, the viewing angle and her emotional state at the time." Id., 670.

On direct appeal, the petitioner claimed, inter alia, that the trial court had improperly delivered prejudicial, erroneous instructions to the jury on the issue of identification. Id., 669. This court upheld the petitioner's conviction and concluded, with respect to the petitioner's jury instruction claim, that it had been waived under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). See *State* v. *Bellamy*, supra, 149 Conn. App. 673–74. Our Supreme Court upheld the judgment of the Appellate Court, which had affirmed the judgment of conviction on direct appeal. See *State* v. *Bellamy*, 323 Conn. 400, 147 A.3d 655 (2016).

In 2016, the petitioner, in a self-represented capacity, filed a petition for a writ of habeas corpus. In January 2023, the petitioner, then represented by counsel, filed the operative, second amended petition for a writ of habeas corpus, alleging, inter alia, ineffective assistance of counsel.[2] Specifically, the petitioner claimed that

[2]The petitioner also alleged a claim of actual innocence and a freestanding due process claim grounded on his assertion that his conviction was based on suggestive or unreliable identification evidence whose reliability the jury was unable to assess because it was deprived of information crucial to its ability to do so. The petitioner, however, withdrew his

his criminal trial counsel, Glenn Conway, had rendered ineffective assistance because he failed **(1)** to conduct a timely and adequate investigation, **(2)** to investigate the alleged motive as presented by the state, **(3)** to investigate and present an alibi defense,[3] **(4)** to consult with or present an eyewitness identification expert, **(5)** to object to inadequate or inaccurate jury instructions regarding eyewitness identification, **(6)** to present evidence from potential witnesses contradicting the state's evidence of motive, and **(7)** to pursue a third-party culpability defense.

The habeas court, *Newson*, *J.*, held a trial on June 15 and August 8, 2023. The petitioner testified and

actual innocence claim before trial. As to the freestanding due process claim, we agree with the respondent, the Commissioner of Correction, that, on appeal, the petitioner "has declined to pursue any challenge to the habeas court's resolution of his freestanding due process claims." See, e.*g.*, *McCarthy* v. *Commissioner of Correction*, 192 Conn. App. 797, 810 n.8, 218 A.3d 638 (2019) ("[i]n habeas corpus proceedings, courts often describe constitutional claims that are not tethered to a petitioner's sixth amendment right to counsel as 'freestanding' ").

The petitioner asserts that his criminal trial counsel, Glenn Conway, had rendered ineffective assistance, which deprived the petitioner of his right to a fair trial and, therefore, violated his due process rights. The petitioner's due process arguments in his principal appellate brief to this court, however, are tethered purely to his ineffective assistance claim, which is the only claim he asserts on appeal. We therefore review the petitioner's claims solely under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See, e.*g.*, *Grant* v. *Commissioner of Correction*, 225 Conn. App. 55, 63–64, 67, 314 A.3d 1 (2024), rev'd on other grounds, 354 Conn. 30, 348 A.3d 463 (2026).

[3] The habeas court stated in its memorandum of decision that "the petitioner [had made] a general allegation that . . . Conway was ineffective for failing to conduct an adequate investigation. Other than the claims that have been addressed [previously], which have all failed, the petitioner has not offered anything specific that he claims . . . Conway failed to discover through investigation that the petitioner claims would have impacted the outcome of the trial. This is nothing more than a 'catchall' claim." The petitioner does not appear to contest this determination on appeal. We therefore address Conway's investigation solely in the context of the specific claims of ineffective assistance that the petitioner asserts on appeal.

The petitioner does not challenge on appeal the habeas court's rejection of his ineffective assistance claim alleging that Conway was ineffective for failing to investigate and present an alibi defense.

also presented testimony from, inter alia, an eyewitness identification expert, Margaret Kovera, a criminal defense expert, Brian Carlow, and Conway. In support of his claim that Conway had improperly failed to present testimony regarding a third-party culpability defense, the petitioner also presented testimony from Garian Suggs. The respondent, the Commissioner of Correction, did not call any witnesses.

On October 10, 2023, the habeas court issued a memorandum of decision denying the operative habeas petition. As to the petitioner's claim that Conway had rendered ineffective assistance, the court concluded that the petitioner had failed to demonstrate either deficient performance or that he had been prejudiced by Conway's representation.

The habeas court first concluded that the petitioner had failed to establish that Conway was ineffective in failing to present testimony from or consult with an eyewitness identification expert. The court noted that, "[a]t the time of [the] petitioner's trial, the law in Connecticut disfavored the admission of expert testimony on the issues of eyewitness identification as an intrusion into the province of the jury."[4] The court stated that "the petitioner has presented nothing unique about the particular circumstances of this case, under the law as it existed in 2010, to warrant the admission of expert testimony to help the jury deal with 'general principles, such as the fact that memories fade over time, that people under severe stress do not acquire information as well as alert persons not under stress, and that people tend unconsciously to resolve apparent inconsistencies between their memories and after acquired facts.'" The court further reasoned that Conway had "substantially explored all of the same areas that an expert would have recommended" during his cross-examination of D.

The habeas court also determined that the petitioner had failed to establish that Conway rendered ineffective

[4]Evidence concluded at the petitioner's criminal trial on November 8, 2010. See *State* v. *Bellamy*, supra, 323 Conn. 404.

assistance by failing to object to the trial court's jury instructions regarding eyewitness identification. The habeas court concluded that "[this] claim fails for lack of evidence." The court stated that the petitioner had "questioned . . . Conway generally about whether he objected to the instructions given by the court" but "failed to specifically address the portions of the instructions he claims [were] erroneous with . . . Conway and also failed to offer the alternative instructions he claims should have [been] offered by . . . Conway or given by the court."

The habeas court likewise rejected the petitioner's claim that Conway had rendered ineffective assistance by failing to raise a third-party culpability defense. The petitioner "[asserted] that . . . Conway should have presented a third-party culpability defense directed at a Norman Boone based on information the petitioner has discovered through interviews with . . . Suggs." The court found that Conway had considered a third-party culpability defense but "was unable to obtain sufficient evidence to connect an actual third party to the shooting. . . . Conway conducted an investigation into . . . Suggs but was unable to find any connection between Suggs and any of the individuals involved in the petitioner's case." The court stated that Suggs' testimony had failed "to establish facts that would have been admissible under a third-party culpability claim . . . ." Moreover, the court concluded that Conway had "made a reasoned decision to proceed with a defense focused on challenging the state's ability to prove the case beyond a reasonable doubt by attacking the credibility of the only eyewitness . . . ." The court found that "Conway believed that challenging the fact that [D] . . . changed her statement and identified the petitioner nearly two years after she had told the police multiple times that she didn't see anything, including during a time immediately after the shooting when she believed her boyfriend may be dead, and that there was no physical evidence tying [the petitioner] to the crime, provided [Conway] a solid basis to attack the state's case."

Finally, the habeas court rejected the petitioner's claim that Conway had rendered deficient performance by failing to investigate the state's evidence on motive and by failing to call witnesses to refute that evidence, namely, Duncan, who had testified for the state that an altercation between the petitioner and Burruss had occurred at the Gotham City nightclub prior to the shooting. The court noted that the alleged altercation "[was not] heavily relied [on] nor central to the state's case." The court also stated that Duncan had "refuted claims that he had identified the petitioner as the shooter, which was potentially very helpful to the petitioner." The court also found that, "given the lack of relative importance of [the alleged altercation], there is no basis to believe that disproving [that] the altercation between the petitioner and Burrus occurred would have had the probable result of changing the outcome of the trial."

The petitioner filed a timely petition for certification to appeal, which the habeas court granted. This appeal followed. Additional facts and procedural history will be set forth as necessary.

We begin by setting forth our well settled standard of review and the legal principles applicable to the petitioner's claims. "Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"The sixth amendment to the United States constitution guarantees a criminal defendant the assistance of counsel for his defense. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674

(1984). *Strickland* requires that a petitioner satisfy both a performance and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against the petitioner on either ground. . . .

"We . . . are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . Similarly, the United States Supreme Court has emphasized that a reviewing court is required not simply to give [counsel] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he or she] did. . . .

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result

must be substantial, not just conceivable. . . . In a habeas proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, 215 Conn. App. 322, 348–50, 282 A.3d 983, cert. denied, 345 Conn. 967, 285 A.3d 736 (2022). We now turn to the merits of the petitioner's claims.

I

The petitioner first claims that the habeas court improperly determined that Conway was not ineffective by failing to consult with, or present the testimony of, an eyewitness identification expert. We are not persuaded.[5]

The following legal principles are relevant to our resolution of this claim. "[T]here is no per se rule that requires a trial attorney to seek out an expert witness. However, this court noted that in some cases, the failure to use any expert can result in a determination that a criminal defendant was denied the effective assistance of counsel. . . . [F]ailing to retain or utilize an expert witness is not deficient when part of a legitimate and reasonable defense strategy. . . . Our appellate courts repeatedly have rejected a petitioner's claim that his trial counsel rendered deficient performance by failing to call an expert witness at trial on the ground that trial counsel's decision was supported by a legitimate strategic reason." (Citation omitted; internal quotation marks omitted.) *Revels* v. *Commissioner of Correction*, 229 Conn. App. 461, 486, 327 A.3d 418 (2024), cert. denied, 351 Conn. 906, 330 A.3d 133 (2025). Moreover, "[i]t is the petitioner's burden to demonstrate that an expert was necessary to establish an asserted defense." *Dearing* v. *Commissioner of Correction*, 230 Conn. App. 145, 158, 329 A.3d 988, cert. denied, 351 Conn. 910, 331 A.3d 158 (2025).

---

[5] Because we conclude that the habeas court properly determined that the petitioner had failed to establish that Conway rendered deficient performance, we need not address *Strickland*'s prejudice prong. See, e.g., *Revels* v. *Commissioner of Correction*, 229 Conn. App. 461, 479 n.9, 327 A.3d 418 (2024), cert. denied, 351 Conn. 906, 330 A.3d 133 (2025).

On appeal, the petitioner asserts that "[a]n expert witness was critical for the defense Conway was pursuing, a [defense of] mistaken identification. An expert could have educated the jury on the grave weaknesses of [D's] identification . . . ." According to the petitioner, expert testimony on eyewitness science would not have been absolutely barred at the time of his criminal trial in 2010 because the trial court had the discretion to admit the testimony of such an expert. We agree with the habeas court that Conway did not render deficient performance by failing to consult with, or present the testimony of, an expert on eyewitness identification.

We consider Conway's performance in light of the controlling law on eyewitness identification in effect at the time of the petitioner's criminal trial. This court previously has stated that "[c]ounsel . . . performs effectively when he elects to maneuver within the existing law . . . ." (Internal quotation marks omitted.) *Bennett* v. *Commissioner of Correction*, 182 Conn. App. 541, 561, 190 A.3d 877, cert. denied, 330 Conn. 910, 193 A.3d 50 (2018). At the time of the petitioner's criminal trial in 2010, "the controlling law on the issue [of eyewitness identification expert testimony] was *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), in which our Supreme Court observed that the reliability of eyewitness identification is within the knowledge of jurors and expert testimony generally would not assist them in determining the question. . . . Such testimony is also disfavored because . . . it invades the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony." (Internal quotation marks omitted.) *Bennett* v. *Commissioner of Correction*, supra, 562. In 2012, two years after the petitioner's criminal trial, our Supreme Court released its decision in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), which overruled *Kemp* and concluded that *Kemp* was "out of step with the widespread judicial recognition that eyewitness identifications are potentially unreliable in a

variety of ways unknown to the average juror." Id., 234.[6] The court stated that cross-examination "often is not as effective as expert testimony at identifying the weaknesses of eyewitness identification testimony because cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs." Id., 243. The court further reasoned that "some circumstances undoubtedly call for more than mere cross-examination of the eyewitness." (Internal quotation marks omitted.) Id., 244.

A

We first conclude that, because the law in effect at the time of the petitioner's criminal trial generally disfavored the admission of expert testimony on eyewitness identification, the habeas court correctly determined that Conway did not perform deficiently by not presenting an expert witness on the issue of eyewitness identification. See, e.g., *Bennett* v. *Commissioner of Correction*, supra, 182 Conn. App. 562 (because law in effect at time of petitioner's criminal trial discouraged use of expert testimony on issue of eyewitness identification, petitioner's criminal trial counsel did not perform deficiently by not presenting expert testimony); see also *Davis* v. *Commissioner of Correction*, 186 Conn. App. 366, 378, 199 A.3d 562 (2018) (same), cert. denied, 330 Conn. 962, 199 A.3d 560 (2019).

We also disagree with the petitioner that Conway's failure to present an expert witness on eyewitness identification was based on a misunderstanding of the applicable law. Specifically, the petitioner contends that our Supreme Court's decision in *State* v. *Outing*, 298 Conn. 34, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131

---

[6]The habeas court noted that the petitioner was not claiming that *Guilbert* should be applied retroactively. On appeal, the petitioner similarly has not argued that *Guilbert* should be applied retroactively to his case. At the time the habeas court released its memorandum of decision, our Supreme Court had not yet decided *Tatum* v. *Commissioner of Correction*, 349 Conn. 733, 758, 322 A.3d 299 (2024), in which the court held that the principles in *Guilbert* did not apply retroactively.

S. Ct. 1479, 179 L. Ed. 2d 316 (2011), stands for the proposition that, at the time of the petitioner's criminal trial, expert testimony on the issue of eyewitness identification was admissible at the discretion of the trial court. The petitioner relies on the fact that Conway had testified at the habeas trial that he believed that, in *Outing*, "the judge denied the motion for an identification expert. That was the state of the law as far as I knew it around that time frame." The petitioner asserts that Conway's "mistaken interpretation constituted ineffective assistance of counsel"[7] and argues that the present case would have been the "perfect vehicle" for challenging *Kemp* and *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999) (expert testimony on reliability of eyewitness identification was unnecessary because average juror knows about factors affecting reliability of such identifications and disfavoring expert testimony on reliability of eyewitness identification because it invades province of the jury to determine what weight to give such evidence), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012).

In *Outing*, however, our Supreme Court expressly declined to address the merits of the defendant's claim that *Kemp* and *McClendon* should be overruled. See *State* v. *Outing*, supra, 298 Conn. 55. Although it is true that the court stated that it was "open to reconsidering *Kemp*

---

[7]According to the petitioner, Conway's habeas testimony reflects a mistaken belief that testimony on the issue of eyewitness identification was categorically barred at the time of the petitioner's criminal trial. The petitioner similarly argues that the habeas court had "misinterpreted both *Guilbert* and *Outing* to hold that expert testimony was absolutely barred." We do not interpret Conway's testimony, or the habeas court's memorandum of decision, so broadly. Conway's testimony that the denial of a motion for an identification expert by the trial court in *Outing* was "the state of the law" was consistent with *Outing* itself as well as with contemporaneous decisional law indicating that such testimony generally was disfavored. It is unreasonable to interpret Conway's testimony to reflect a belief that such testimony was categorically barred. Furthermore, in its memorandum of decision, the court stated that, "[a]t the time of the petitioner's trial, the law in Connecticut disfavored the admission of expert testimony on the issues of eyewitness identification as an intrusion into the province of the jury."

and *McClendon*"; id., 62; it is equally true that Conway did not have an obligation to use the petitioner's case to try to overturn our Supreme Court's precedent. As this court previously has stated, "[t]o impose on counsel the duty to foretell what tack our Supreme Court would take on this subject represents the height of post hoc reasoning, which is not the task of a court on habeas review." *Outing* v. *Commissioner of Correction*, 190 Conn. App. 510, 535–36, 211 A.3d 1053, cert. denied, 333 Conn. 903, 214 A.3d 382 (2019), cert. denied sub nom. *Outing* v. *Cardona*, 589 U.S. 1220, 140 S. Ct. 1166, 206 L. Ed. 2d 212 (2020).

The petitioner relies on Justice Palmer's concurring opinion in *State* v. *Outing*, 298 Conn. 88, to argue that Conway should have consulted with or presented testimony from an expert witness on eyewitness identification. In that concurring opinion, Justice Palmer stated that our Supreme Court "has an obligation to reconsider and overrule *Kemp* because its holding is invalid and because its application results in evidentiary rulings that deprive defendants of a fair opportunity to demonstrate the weaknesses inherent in eyewitness identifications, evidence that results in more wrongful convictions than any other evidence." Id., 124. Although Justice Palmer's view ultimately prevailed with the majority of our Supreme Court in *Guilbert*, the majority of the court in *State* v. *Outing*, supra, 34, did not adopt his view. See *Muckle* v. *Pressley*, 185 Conn. App. 488, 496 n.7, 197 A.3d 437 (2018) ("a concurring opinion from our Supreme Court is not binding authority"). The majority in *State* v. *Outing*, supra, 34, expressly declined to overrule *Kemp*, and we therefore cannot conclude that Conway rendered deficient performance by following the controlling case law in effect at the time of the petitioner's criminal trial.[8] See, e.g., *Grant* v. *Commissioner*

[8]Similarly, we disagree with the petitioner's reliance on *State* v. *Maner*, Docket No. CR-08-0375803, 2011 WL 3671909 (Conn. Super. July 19, 2011), a nonbinding Superior Court decision released approximately six months after the petitioner's criminal trial. The trial court in *Maner* relied extensively on Justice Palmer's concurring opinion in

*of Correction*, 225 Conn. App. 55, 73, 314 A.3d 1 (2024) ("[b]ecause [counsel's] decision not to consult with or present the testimony of an eyewitness expert was not inconsistent with the law at the time of the petitioner's trial, we agree with the habeas court's determination that her decision was reasonable"), rev'd on other grounds, 354 Conn. 30, 348 A.3d 463 (2026).[9]

B

Similarly, we reject the petitioner's argument that Conway's decision not to consult with an expert witness constituted deficient performance because "an expert would have been greatly helpful in educating the jury and assisting Conway in attacking the one piece of evidence he could not ignore: [D]'s identification." We agree with the respondent that Conway's decision to not consult an eyewitness identification expert was a reasonable exercise of his professional judgment. Conway testified at the habeas trial that he did not consult with an eyewitness identification expert because it was a "blossoming science" at the time. Moreover, the petitioner acknowledges that, at trial, "[Conway] argued [that] stress, distance, poor lighting, and the length of time between [the] incident and [the] identification rendered [D's] identification unreliable." As stated previously, under the controlling law at the time of the criminal

*State* v. *Outing*, 298 Conn. 88, to conclude that expert testimony on eyewitness identification was admissible. See *State* v. *Maner*, supra, *10–11. As stated previously in this opinion, however, the majority of our Supreme Court in *State* v. *Outing*, supra, 34, declined to overrule *Kemp* and *McClendon*.

[9]We disagree with the petitioner's attempt to distinguish *Grant* on the ground that, in that case and in other cases, "counsel considered using an expert, but decided against it on a tactical basis," whereas, in the present case, Conway believed such testimony was categorically barred. As noted previously, we do not interpret Conway's testimony so broadly. See footnote 7 of this opinion. Moreover, this court in *Grant* noted, similar to the present case, that, "at the time of the petitioner's case, the science was still relatively new, there was no standard or expectation at that time to call an eyewitness identification expert and such an expert would typically not have been admissible at trial." (Internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, supra, 225 Conn. 71.

trial in this case, the admission of expert testimony on the issue of identification was generally disfavored. The habeas court determined, and we agree, that Conway had explored substantially the same areas during his cross-examination of D that an expert would have recommended.[10] See, e.g., *Love* v. *Commissioner of Correction*, 223 Conn. App. 658, 671–72, 308 A.3d 1040 (rejecting petitioner's claim that habeas court improperly concluded that his trial counsel's failure to consult with eyewitness identification expert constituted deficient performance and concluding that trial counsel's strategy to undermine impact of eyewitness identifications through cross-examination was reasonable), cert. denied, 348 Conn. 958, 310 A.3d 960 (2024). The petitioner thus has failed to prove that Conway needed to consult with an expert to attack D's identification testimony.

Accordingly, we conclude that the habeas court properly determined that the petitioner did not establish deficient performance under *Strickland* regarding Conway's failure to consult with or present the testimony of an eyewitness identification expert.

II

Next, the petitioner claims that Conway rendered ineffective assistance by failing to object to the trial court's jury instructions on eyewitness identification or to propose alternative instructions to educate the jury on the common fallibilities of eyewitness identifications.[11]

---

[10]Specifically, the habeas court noted that, on cross-examination of D, Conway had "elicited an admission from [D] that she told two different police officers at two different times the night of the incident that she did not see anyone and could not identify any shooter. He also questioned her thoroughly about her vantage point from the window within the house she claimed to have been looking out, the lighting available to her outside, the possibility of how a light she had on inside the room may have interfered with her ability to see outside, and the fact that she was not very familiar with [the petitioner], having only seen him 'a few times' in the eighteen months prior to the shooting."

[11]The petitioner contends that this claim warrants "broader review" on the ground that his due process rights were violated because Conway was not competent and had failed to call an eyewitness identification expert to testify. We note that the petitioner has not properly raised

The respondent counters that the court's instructions sufficiently guided the jury and that the petitioner has failed to overcome the presumption that Conway acted as reasonably competent counsel.[12] We agree with the respondent.[13]

The following legal principles are relevant to our resolution of this claim. "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate [on] legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Inzitari*, 351 Conn. 86, 103–104, 329 A.3d 215 (2025). "[T]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error . . . ." (Internal quotation marks omitted.) *Antwon W.* v. *Commissioner of Correction*, 172 Conn. App. 843, 871, 163 A.3d 1223, cert. denied, 326 Conn. 909, 164 A.3d 680 (2017). "The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which [it] might

a freestanding due process claim in his operative habeas petition. See footnote 2 of this opinion. As stated previously, we review the petitioner's claim pursuant to *Strickland.*

[12]As noted previously, our Supreme Court concluded that the petitioner had waived his unpreserved jury instruction claim pursuant to *Kitchens.* See *State* v. *Bellamy*, supra, 323 Conn. 402–403. Our Supreme Court stated that "only in the habeas court may a record be developed sufficient to determine whether counsel waived the claim for constitutionally acceptable strategic reasons." Id., 431.

[13]Because we conclude that the habeas court properly determined that the petitioner had failed to establish that Conway rendered deficient performance, we need not address *Strickland*'s prejudice prong. See, e.g., *Revels* v. *Commissioner of Correction*, supra, 229 Conn. App. 479 n.9.

find to be established. . . . The charge must go beyond a bare statement of accurate legal principles to the extent of indicating to the jury the application of those principles to the facts claimed to have been proven." (Internal quotation marks omitted.) *Walton* v. *Commissioner of Correction*, 57 Conn. App. 511, 524, 749 A.2d 666, cert. denied, 254 Conn. 913, 759 A.2d 509 (2000).

At the habeas trial, the petitioner's habeas counsel asserted during closing argument that Conway was ineffective for failing to object to the trial court's identification instructions. Specifically, habeas counsel argued that "[t]here's hardly any information give[n]. It basically just tells the jury [to] consider the identification, consider the witness' confidence. It doesn't give them any tools, doesn't give them information, doesn't tell them about transference or postevent information,[14] that witness confidence is at the time meaningless, psychological effects of stress, the issues of first time in-court [identifications], none of it." (Footnote added.) The habeas court rejected the petitioner's claim for lack of evidence. The court noted that, although the petitioner had questioned Conway as to whether he objected to the instructions given by the trial court, the petitioner "failed to specifically address the portions of the instructions he claims [were] erroneous with . . . Conway and also failed to offer the alternative instructions he claims should have [been] offered by . . . Conway or given by the court." The habeas court noted that "[t]he trial court appears to have given standard form identification instructions to the jury. In order to succeed on his claim . . . the petitioner has some burden to offer the alternative or additional instructions he claims should have been provided to the jury. The petitioner's failure to do so is fatal to these claims." (Footnote omitted.)

[14]Kovera had noted in her report, which was admitted into evidence at the habeas trial, that a witness' accuracy and reliability could be impeded by "transference effects," noting that, when a witness has "had the opportunity to observe someone in a context other than the witnessed event . . . it is possible that the sense of familiarity engendered by that person may cause the witness to misidentify them as the perpetrator of a witnessed crime."

For the reasons that follow, we conclude that the habeas court's determination that the petitioner had failed to establish deficient performance on the basis of his criminal trial counsel's failure to object to the trial court's jury instructions was reasonable. The trial court's instructions were correct as given, and "further elucidation was not required to satisfy the standard of reasonably competent representation." *King* v. *Commissioner of Correction*, 193 Conn. App. 61, 71, 218 A.3d 1051 (2019); see also, e.g., *Walton* v. *Commissioner of Correction*, supra, 57 Conn. App. 524 (counsel did not render ineffective assistance by failing to object to jury instruction when jury instruction was correct statement of law).

As our Supreme Court has previously explained, the trial court in the present case instructed the jury on the issue of identification two different times. See *State* v. *Bellamy*, supra, 323 Conn. 406. The trial court initially charged that, "the jury, in deciding whether to believe all, some or none of a witness' testimony, should consider a number of factors, including: (1) Was the witness able to see, hear and know the things about which the witness testified? (2) How well was the witness able to recall and describe those things? (3) What was the witness' manner and demeanor while testifying? (4) Did the witness have any interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case? (5) How reasonable was the witness' testimony considered in light of all of the evidence in the case? And (6) [w]as the witness' testimony contradicted by what that witness has said or done at another time or by the testimony of other witnesses or other evidence?" (Internal quotation marks omitted.) Id., 406 n.4.

The trial court subsequently instructed the jury on the issue of identification in relevant part: "Identity is an issue in every criminal case. . . . You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the [petitioner] before you convict him. It is your duty to recall and weigh and consider all of the

evidence relating to the identification of the [petitioner]. You should consider the opportunity the witness had to observe the [petitioner], the degree of certainty of the identification made by the witness, whether the witness knew the [petitioner] before the identification [and] any other circumstances that you think are relevant to the issue of identification of the [petitioner].''

We agree with the respondent that the jury instructions on the issue of identification, read as a whole, "did not mislead the jury and offered proper guidance for the determination of those elements present." As noted in part I of this opinion, at the time of the petitioner's criminal trial in 2010, our Supreme Court's decision in *State* v. *Guilbert*, supra, 306 Conn. 218, which comprehensively outlined the developments in the cognitive science of eyewitness identification, had not yet been released. Thus, at the time of the petitioner's criminal trial, evidence concerning eyewitness identification was generally understood to be within the realm of common experience and could be evaluated without expert assistance. See, e.g., *State* v. *Kemp*, supra, 199 Conn. 477. Accordingly, Conway reasonably declined to object to the trial court's instruction on the basis of the burgeoning scientific advancements in the field of eyewitness identification, particularly as expert testimony had not been admitted on those issues at trial. Thus, the court's instructions were consistent with the controlling decisional law on the issue of identification at the time of the petitioner's criminal trial. It is well settled that, "while the failure to advance an established legal theory may result in ineffective assistance of counsel under *Strickland*, the failure to advance a novel theory never will." (Internal quotation marks omitted.) *Roberts* v. *Commissioner of Correction*, 155 Conn. App. 360, 370, 109 A.3d 956, cert. denied, 316 Conn. 902, 111 A.3d 470 (2015). Indeed, the court's instruction on identification was nearly identical to the language in D. Borden & L. Orland, 5 Connecticut Practice Series: Criminal Jury Instructions (4th Ed. 2007) § 3.14, Identification, pp.

203–204.[15] "While not dispositive of the adequacy of the instruction, an instruction's uniformity with the model instructions is a relevant and persuasive factor in our analysis." *State* v. *Sanchez*, 84 Conn. App. 583, 592 n.10, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004).

We also agree with the habeas court that the petitioner's claim failed for lack of evidence. The petitioner points to his counsel's closing argument at the habeas trial as evidence of the specific instructions the petitioner claims should have been included vis-à-vis the issue of eyewitness identification. The arguments of counsel, however, are not evidence. And, although the petitioner presented testimony from Carlow, a legal expert, Carlow merely testified that he would have objected to the proposed instructions and did not opine that the instructions were legally erroneous or offer any additional specific information that he would have requested to be included in the instructions.

Moreover, we disagree with the petitioner that information regarding "transference or postevent information, that witness confidence is at the time meaningless, psychological effects of stress, [and] the issues of first time in-court [identifications]" must have been included in the trial court's instructions for them to be legally correct at the time of the petitioner's criminal trial in 2010. Indeed, the petitioner does not appear to claim that the instructions were legally erroneous but, rather,

---

[15]Section 3.14 provides in relevant part: "You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. . . . It is your duty to recall and to weigh and consider all of the evidence relating to the identification of this defendant. You should take into account the opportunity the witness had to observe the person, the degree of certainty of the identification made in court, whether the witness knew the person before the identification, (the circumstances and degree of certainty of any out of court identification made, whether by photograph or in a line-up or other display of the person), the length of time between the event in question and the identification here in court (or out of court), and any other circumstance which you think is relevant to this issue of the identification of the defendant." D. Borden & L. Orland, supra, § 3.14, pp. 203–204.

that they represented a "truncated version" of the model instructions that were in effect in 2010 and available on the Judicial Branch website. The petitioner, however, has not provided this court with a copy of the 2010 model criminal jury instructions on the Judicial Branch website but refers only to the 2021 version of the identification instruction.[16] With respect to the 2021 version of the model criminal jury instructions, the parties agree that the 2021 version refers to numerous factors that were delineated in *United States* v. *Telfaire*, 469 F.2d 552, 558–59 (D.C. Cir. 1972),[17] concerning issues of eyewitness identification. See Connecticut Criminal

[16]The petitioner points us to his petition for certification in his direct appeal, which was part of the trial court file and a copy of which was admitted into evidence at his habeas trial. In his 2014 petition, the petitioner quoted from portions of the model jury instructions. For instance, the petition for certification relies on a portion of the model instructions indicating that "certainty does not mean accuracy," and that the jury should consider "the witness' physical and emotional condition at the time of the incident." (Internal quotation marks omitted.) The 2014 petition for certification to appeal, however, which was filed after *Guilbert* was released, does not indicate which version of the model instructions the petitioner was quoting. The petitioner similarly points to excerpts of his brief on direct appeal, which he included in the appendix to his principal brief to this court and which quoted from what he referred to as the 2007 version of the model jury instructions.

Even if we assume that the model jury instructions available on the Judicial Branch website in 2010 contained the precise language the petitioner relied on in his petition for certification to appeal and in his brief on direct appeal, we agree with the respondent that trial courts are not required to quote from the model instructions verbatim, as "[t]he language used in the model jury instructions, although instructive . . . is not binding on [a reviewing] court." (Internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 599, 275 A.3d 578 (2022).

[17]See *State* v. *Tatum*, 219 Conn. 721, 733–34, 595 A.2d 322 (1991) ("[t]he *Telfaire* instruction tells the jury to consider in appraising the identification testimony of a witness the adequacy of his opportunity and his capacity to observe the offender; the length of time available for the witness to observe the offender; the proximity of the witness to the defendant; whether the witness had seen or known this person in the past; whether the identification was a product of the witness' own recollection; and the credibility of the witness" (internal quotation marks omitted)), overruled in part on other grounds by *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017).

Jury Instructions 2.6-4, available at https://www.jud.
ct.gov/JI/Criminal/Criminal.pdf (last visited August 5,
2026). We agree with the respondent that the trial court's
instructions, taken as a whole, substantially referenced
the *Telfaire* factors,[18] as the court, in addition to its
general instructions on witness credibility, instructed
the jury to consider the opportunity the witness had to
observe the petitioner, the certainty of the identification,
and whether the witness knew the petitioner before the
identification.

The petitioner argues that the *Telfaire* factors have
been cast into doubt by more recent scientific and psycho-
logical studies in the field of eyewitness identification.
As stated previously, however, the *Telfaire* factors are
still included in the model jury instructions. See Con-
necticut Criminal Jury Instructions, supra, 2.6-4. The
petitioner asserts that the 2010 model jury instructions
"included the caveat that certainty does not equal accu-
racy; that the witness' physical and mental condition
should be considered; that distance and lighting should
be considered, and that the length of time between [the]
crime and [the] identification should be considered." See
footnote 16 of this opinion. As stated previously in this
opinion, however, even if we assume arguendo that this
specific information was contained in the 2010 model
jury instructions, which the petitioner has not provided
to this court, the trial court's instructions were still suf-
ficient to guide the jury and were not incorrect in law.
See, e.g., *State* v. *Leveille*, 232 Conn. App. 687, 707,
337 A.3d 797 (2025) ("[j]ury instructions need not be
exhaustive, perfect or technically accurate, so long as

[18]We note that the 2021 version of the model jury instructions on the
Judicial Branch website indicates that § 2.6-4 was revised once in 2017.
At that time, the commentary was revised to address the procedure to
be followed pursuant to *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810
(2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713
(2017), when the court disallows a first time in-court identification of
the defendant and the state requests an instruction. Section 2.6-4 was
revised again in 2021, in accordance with our Supreme Court's decisions
in *Guilbert* and *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018).
See Connecticut Criminal Jury Instructions, supra, 2.6-4, pp. 25–26.

they are correct in law, adapted to the issues and sufficient for the guidance of the jury" (internal quotation marks omitted)).

To the extent the trial court's language did not include the exact language in the model jury instructions available on the Judicial Branch website, "[t]he language used in the model jury instructions, although instructive in considering the adequacy of a jury instruction . . . is not binding on this court. . . . [W]e previously have cautioned that the . . . jury instructions found on the Judicial Branch website are intended as a guide only, and that their publication is no guarantee of their adequacy. . . . The Judicial Branch website expressly cautions that the jury instructions contained therein [are] intended as a guide for judges and attorneys in constructing charges and requests to charge. The use of these instructions is entirely discretionary and their publication by the Judicial Branch is not a guarantee of their legal sufficiency." (Citations omitted; internal quotation marks omitted.) *State* v. *Gomes*, 337 Conn. 826, 853 n.19, 256 A.3d 131 (2021).

Finally, the petitioner's claim is mere speculation because, even if Conway had objected to the trial court's instruction, the petitioner has not established that it was reasonably likely that the court would have delivered his proposed instructions, had he offered any, and that a different result would follow. See, e.*g.*, *Walker* v. *Commissioner of Correction*, 230 Conn. App. 108, 127, 328 A.3d 665 ("petitioner cannot rely on mere conjecture or speculation to satisfy either the performance or prejudice prong [of *Strickland*] but must instead offer demonstrable evidence in support of his claim" (internal quotation marks omitted)), cert. denied, 351 Conn. 910, 331 A.3d 158 (2025). We therefore agree with the habeas court that the petitioner had failed to establish that Conway's performance was deficient by virtue of his declining to object to the trial court's jury identification instructions.

### III

The petitioner next claims that Conway failed to adequately investigate and present a defense of third-party culpability regarding Boone. The petitioner argues that Conway rendered ineffective assistance by failing to present the third-party culpability claim and that, if he had, this evidence would have "dramatically bolstered the defense case at trial." The respondent counters that Conway had conducted a reasonable investigation and made a strategic decision not to pursue this line of defense. We agree with the respondent.

The following additional facts, as described by the habeas court in its memorandum of decision, are relevant. "The weapon used in the petitioner's case was never recovered, but it was identified as a [nine millimeter] Glock pistol from shell casings left at the scene. In discovery, the state turned over evidence that the same [nine millimeter] Glock was identified as having been used in a separate shooting, also through spent shell casings, about three weeks before the crime for which the petitioner [was convicted]. The petitioner was not a suspect in this earlier incident. That prior shooting incident was on March 28, 2008, in the area of 281 Whalley Avenue, New Haven. From other evidence at the Whalley Avenue scene, the police were able to determine that incident also involved the discharge of shots from [a] .380 caliber handgun. . . . Suggs was ultimately identified as one of the shooters in the Whalley Avenue incident and had what was determined to be the same .380 caliber weapon in his possession when he was arrested on May 2, 2008. Suggs was later convicted on November 13, 2008, of carrying that .380 caliber pistol without a permit. The second shooter in that incident was never identified. . . .

"Conway admitted that Suggs was identified in discovery he received about the 281 Whalley Avenue shooting. Suggs testified at the habeas trial that . . . Boone, his cousin, was the second individual with him at that March 28, 2008 incident on Whalley Avenue and that Boone was the person firing the [nine millimeter] Glock.

Suggs also testified that he stayed at Boone's house on the evening of April 18 into the morning on April 19, 2008, but that Boone did not come home that evening. When Boone did come home sometime on April 19, Suggs testified that they 'discussed' the [nine millimeter] weapon Boone previously had on March 28. Suggs also testified [that] 'he did not see' the [nine millimeter] weapon in Boone's possession that morning. Finally, Suggs also testified that Boone showed him a gold medallion that 'looked similar' to a large gold medallion being worn by one of the victims in a photograph taken the night of the shooting but not recovered from the scene. . . . Suggs did not testify that Boone ever told him where he got that medallion." (Citation omitted; footnote omitted.)

We begin our analysis of the petitioner's claim by setting forth the applicable legal principles. "To determine whether an objectively reasonable attorney would decide not to present a third-party culpability defense on the ground of inadmissibility, it is necessary to review the legal principles underlying such a defense: The admissibility of evidence of [third-party] culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly . . . the proffered evidence [must] establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party . . . . Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of [third-party] culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's

decision, therefore, that [third-party] culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. . . .

"Whether a defendant has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry. . . . [T]his court has found the direct connection threshold satisfied for purposes of [third-party] culpability when physical evidence links a third party to a crime scene and there is a lack of similar physical evidence linking the charged defendant to the scene. . . . Finally, this court has found that statements by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he or she has been charged, can sufficiently establish a direct connection for [third-party] culpability purposes." (Citation omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 564–65, 198 A.3d 52 (2019).

Furthermore, "[t]he right to the effective assistance of counsel applies no less to the investigative stage of a criminal case than it does to the trial phase. . . . Counsel's strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. . . . [A] court must consider not only the quantum of evidence already known to counsel, but also whether the known

evidence would lead a reasonable attorney to investigate further. . . . In addition, in contrast to our evaluation of the constitutional adequacy of counsel's strategic decisions, which are entitled to deference, when the issue is whether the investigation supporting counsel's [strategic] decision to proceed in a certain manner was itself reasonable . . . we must conduct an objective review of [the reasonableness of counsel's] performance . . . . Thus, deference to counsel's strategic decisions does not excuse an inadequate investigation . . . .

"Although the reasonableness of any particular investigation necessarily depends on the unique facts of any given case . . . counsel has certain baseline investigative responsibilities that must be discharged in every criminal matter. It is the duty of the [defense] lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case . . . .

"Of course, the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste. . . . In other words, counsel is not required to conduct an investigation that promise[s] less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, supra, 225 Conn. App. 68–70.

In the present case, Boone was identified as a potentially culpable third party. At the habeas trial, Detective Reginald Sutton testified that he had investigated the petitioner's case and interviewed Boone regarding the shooting. Sutton recalled that, during his investigation, he had heard someone, whom he could not recall, say, "if it wasn't [the petitioner], it was [Boone]." Conway testified that he might have pursued a third-party culpability defense, but "[he] just couldn't get across . . . the legal threshold." Conway testified that he had wanted to

focus on attacking the sufficiency of the state's evidence, particularly D's identification. Conway further stated that another focus of his defense was to attack the police investigation. Conway testified that, during his investigation, he had obtained reports that the gun involved in the shooting was used in a prior incident, a fact that was stipulated to by the state. This written stipulation, which was admitted into evidence, indicates that Suggs was arrested in relation to the prior incident. Conway testified that he had investigated Suggs but could not recall there being "any nexus between . . . Suggs and the victims in this case."

The petitioner presented testimony at the habeas trial from Carlow, who testified that he would have expected counsel to pursue a third-party defense, specifically, by speaking to Suggs and presenting "the evidence of what . . . Sutton knew, what . . . Suggs had to say, both in terms of the weapon being in . . . Boone's hands three weeks before the incident and the medallion or the piece of jewelry that . . . Boone had after this incident."

In its memorandum of decision, the habeas court found that Conway had considered pursuing a third-party culpability defense with respect to Boone but "was unable to obtain sufficient evidence to connect an actual third party to the shooting. . . . Conway conducted an investigation into . . . Suggs but was unable to find any connection between Suggs and any of the individuals involved in the petitioner's case. . . . Given [that] the court does not find it credible that Suggs would have given up Boone, his cousin, as a suspect even if . . . Conway had questioned him, the petitioner has failed to prove that it was deficient for . . . Conway not to have done further investigation into him . . . . Finally, given the determination that [Suggs'] testimony fails to establish facts that would have been admissible under a third-party culpability claim, the petitioner has also failed to establish that he was prejudiced." (Citations omitted; footnotes omitted.)

On the basis of our review of the record, we find reasonable the habeas court's conclusion that the petitioner

had failed to affirmatively prove that Conway's failure to investigate the third-party culpability claim constituted ineffective assistance of counsel. As to the performance prong of *Strickland*, the petitioner has not demonstrated that Conway's decision not to investigate or present a third-party culpability claim involving Boone was anything other than sound trial strategy. In reviewing ineffective assistance of counsel claims, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, 158 Conn. App. 431, 449, 119 A.3d 607 (2015).

In the present case, Conway testified that he had investigated Suggs but could not find any connection between Suggs and any of the individuals involved in the shooting in this case. Conway testified that it was clear the petitioner was not involved in the prior Whalley Avenue shooting, as he was incarcerated at that time. Conway stated that, "being aware of that, I know [the prosecutor] right from the outset was raising this issue of third-party culpability and asking the judge to admonish me unless or until I could meet the legal threshold. So, just . . . saying that, well, these shots were fired over here in this area at a time [when the petitioner] could not have had this,

so, clearly, that guy must be the shooter. I was told in no uncertain terms I couldn't do that. . . . [Y]ou've got to have some nexus between, something that ties them to the victims, motive, proximity, something. And, it just—there were parallel lines. I could never get them to cross. . . . I was unable to get enough evidence linking somebody in the most smallest way to this event, this incident and, therefore, [was] precluded from getting [a third-party culpability] instruction."

Moreover, although Suggs stated that he had not been contacted by Conway and that he would have told Conway what he testified to at the habeas trial if he had been contacted, the habeas court did not find Suggs' testimony to be credible. The court noted that Suggs and Boone were cousins, that Suggs' identification of Boone was "convenient" because Boone had died in 2017, and that Suggs previously had refused to identify Boone as a second shooter in the Whalley Avenue case. It is well settled that we do not second-guess on appeal the credibility determinations of the habeas court. See, e.g., *Ayuso* v. *Commissioner of Correction*, supra, 215 Conn. App. 343.

Because Conway did not find any evidence linking Suggs to the present case, we cannot conclude that reasonable diligence required Conway to speak to Suggs as part of his investigation.[19] See, e.g., *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 33, 188 A.3d 1 (2018), cert. denied, 586 U.S. 1068, 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019); see also *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 314, 267 A.3d 120 (2021) ("[i]t is not ineffective assistance of counsel . . . to decline to pursue a [third-party] culpability defense when there is insufficient evidence to support that defense" (internal quotation marks omitted)). Given the court's findings

---

[19]Although Carlow testified that he would have expected counsel to speak to Suggs, we conclude that, in discrediting Suggs' testimony, the habeas court had implicitly discredited Carlow's testimony as to this issue. See, e.g., *Canady* v. *Commissioner of Correction*, 231 Conn. App. 603, 626, 333 A.3d 797 (habeas court implicitly discredited petitioner's testimony regarding plea negotiations), cert. denied, 352 Conn. 901, 334 A.3d 1006 (2025).

that Conway had conducted a reasonable investigation and had a reasonable basis for focusing his defense on attacking D's credibility, we cannot conclude that Conway's performance was deficient. The court reasonably concluded that the petitioner did not overcome the presumption that Conway's conduct fell within the wide range of reasonable professional assistance and therefore correctly concluded that Conway's performance was not deficient.

As to the prejudice prong of *Strickland*, the petitioner failed to present any credible evidence demonstrating that Boone had any connection to the shooting. As the respondent noted in his brief, although Suggs had implicated Boone in the murder by linking Boone to the murder weapon in 2023, after Boone had died in 2017, "the habeas court declined to credit Suggs' testimony that he would have implicated Boone at the time of the petitioner's trial in 2010." As stated previously, we decline to disturb that credibility determination on appeal. See, e.g., *Ayuso* v. *Commissioner of Correction*, supra, 215 Conn. App. 343. The petitioner must "present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the [petitioner] is accused." (Internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, supra, 158 Conn. App. 446. Accordingly, the petitioner has not established that it was reasonably likely that a third-party culpability defense related to Boone would have led to a different result at his criminal trial. Thus, he failed to demonstrate that he was prejudiced by Conway's actions. For the foregoing reasons, we conclude that the habeas court properly concluded that Conway did not render ineffective assistance when he failed to investigate or present a third-party culpability claim.

IV

The petitioner's final claim is that Conway provided ineffective assistance by failing to investigate and call

witnesses who could have refuted the state's evidence on motive.[20] According to the petitioner, the state had argued at trial that the petitioner was seeking revenge after losing an altercation to the victims at Gotham City. The petitioner contends that there were witnesses who could have testified that no such altercation took place. The respondent counters that it was reasonable to forgo calling these witnesses because, inter alia, Conway's investigation had uncovered a video recording depicting the altercation at Gotham City. We agree with the respondent.[21]

The following additional facts and procedural history are relevant to our resolution of this claim. At the petitioner's criminal trial, Duncan testified that, at about the time of the shooting, he was living with D. Duncan testified that, on the night of the shooting, he witnessed the

[20]The petitioner asserts in his principal appellate brief that "[t]he habeas court erred in holding that Conway's failure to investigate, discover and offer testimony" from certain witnesses who would have refuted the state's evidence on motive. The petitioner, however, does not identify any specific deficiencies in Conway's investigation of these witnesses. To the extent the petitioner intended to raise a separate claim that Conway had rendered deficient performance for conducting an inadequate investigation into witnesses who could have refuted the state's evidence on motive, we conclude that this claim is inadequately briefed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Internal quotation marks omitted.) *Balbuena* v. *Commissioner of Correction*, 231 Conn. App. 289, 306–307, 332 A.3d 1008, cert. denied, 352 Conn. 905, 335 A.3d 845 (2025).

[21]Because we conclude that the habeas court correctly determined that the petitioner had failed to prove that Conway's performance was deficient in not presenting testimony to contradict the state's evidence on motive, we need not address the prejudice prong of *Strickland*. See, e.g., *Rosa* v. *Commissioner of Correction*, 171 Conn. App. 428, 435 n.6, 157 A.3d 654, cert. denied, 326 Conn. 905, 164 A.3d 680 (2017).

petitioner and Burruss get into a "tussle" inside Gotham City. Duncan indicated that the altercation included pushing and testified that Burruss was getting "the best" of the petitioner. Duncan testified that, later that night at the crime scene, he heard a voice say, "[w]hat up now," as a person came from the side of the house and started firing. Duncan also stated that he could not recall telling Burruss' mother that the petitioner had killed Burruss. At trial, the prosecutor relied on Duncan's testimony in arguing that the altercation at Gotham City was the motivation for the shooting.

At the habeas trial, the petitioner presented the testimony of Tavon Long, De'Ari Allick, and Jason Holmes relating to the alleged altercation at Gotham City. Long testified that the petitioner was his "childhood best friend" and that they had gone to Gotham City on the night of the shooting. Long testified that he did not remember seeing Burruss, whom he knew from around the neighborhood, at Gotham City. He also testified that he did not see the petitioner get into an altercation at Gotham City. Allick, another friend of the petitioner, similarly testified that he was unaware of the petitioner's being involved in an altercation at Gotham City on the night in question. Finally, Holmes testified that he knew the petitioner in 2008 and that they had gone to school together. Holmes testified that, on the night of the incident, he saw the petitioner at Gotham City but did not see an altercation involving the petitioner. When Conway was asked at the habeas trial about the state's evidence concerning the altercation, he testified that he had investigated the state's motive evidence. Conway testified that he went to Gotham City and "looked at the videos. I don't remember who we spoke to. But, it . . . seemed more like a pushing match that got separated quite quickly."

The following legal principles are relevant to our disposition of this claim. "When faced with the question of whether counsel performed deficiently by failing to call a certain witness, the question is whether this omission

was objectively reasonable because there was a strategic reason not to offer such . . . testimony . . . [and] whether reasonable counsel could have concluded that the benefit of presenting [the witness' testimony] . . . was outweighed by any damaging effect it might have." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 539. Although evidence of motive is "unnecessary to establish the elements of the crimes charged, such evidence nevertheless is important, and proving a motive is likely to strengthen the state's case. . . . Evidence of motive, like all of the other evidence in [a] case, must be weighed by the jury. . . . The role motive plays in any particular case necessarily varies with the strength of the other evidence in the case. The other evidence may be such as to justify a conviction without any motive being shown. [Alternatively] [i]t may be so weak that without a disclosed motive the guilt of the accused would be clouded by a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 610, 103 A.3d 954 (2014).

In its memorandum of decision, the habeas court noted that "Duncan was the only witness at the trial who testified in any detail about [the] alleged altercation," which the court stated was a "small part" of the underlying criminal case. The court emphasized that the strength of the state's case rested not on this motive evidence but, rather, on D's identification evidence. Moreover, the court stated that it was reasonable for Conway not to focus on the issue of the altercation, reasoning that presenting evidence to contradict Duncan's testimony would have risked weakening the petitioner's defense, as Duncan had denied that he had previously identified the petitioner as the shooter. The court therefore concluded that the petitioner had failed to prove that Conway was deficient in his performance or that he was prejudiced with respect to this claim.

We conclude, on the basis of our review of the record, that the habeas court correctly determined that Conway's

decision not to contradict Duncan's testimony was not objectively unreasonable. See *Balbuena* v. *Commissioner of Correction*, 231 Conn. App. 289, 341, 332 A.3d 1008 ("[o]ur conclusion that [defense counsel's] strategic decision not to undermine favorable evidence was not objectively unreasonable requires no elaboration"), cert. denied, 352 Conn. 905, 335 A.3d 845 (2025). Although Long, Allick and Holmes testified that they did not believe that an altercation between the petitioner and Burruss had occurred, Conway testified that he had viewed a video recording that "[put the petitioner] at the scene of [Gotham City] earlier in the night when [there was] an altercation between him and [Burruss]." On the basis of that contradictory evidence, Conway reasonably could have declined to call Long, Allick and Holmes as witnesses. The record before the court also included Duncan's testimony at the criminal trial, the transcripts of which were admitted into evidence, and Duncan testified that the petitioner *did* have an altercation with Burruss at Gotham City. As the habeas court noted, Conway reasonably could have made the strategic decision not to attack Duncan's testimony concerning this "small part" of the underlying criminal trial, as Duncan denied at the criminal trial that he had previously identified the petitioner as the shooter in the present case.[22] Such strategic choices made by counsel are "virtually unchallengeable when made after thorough investigation of law and facts relevant to plausible options . . . ." (Internal quotation marks omitted.) *Godfrey-Hill* v. *Commissioner of Correction*, 221 Conn. App. 526, 542, 302 A.3d 923, cert. denied, 348 Conn. 929, 304 A.3d 861 (2023).

---

[22]Although, at the habeas trial, Conway could not recall speaking to Long at the time of the petitioner's criminal trial, Conway listed Long as a potential witness during jury selection at the petitioner's criminal trial, although he ultimately did not call Long as a witness. During the habeas trial, Conway could not recall having called Allick to testify at the criminal trial. Holmes testified that Conway and an investigator had contacted him concerning the present case and that "they wanted me [to testify]" but that he refused to testify at the criminal trial "because I was already in prison . . . and I didn't want to make it seem like I was telling on anybody or anything like that."

Accordingly, we conclude that the habeas court correctly determined that the petitioner had failed to establish that Conway's performance was deficient by failing to call witnesses to refute the state's evidence of motive, as the petitioner failed to present evidence sufficient to overcome the presumption that Conway's decision not to call those witnesses was made on the basis of strategic reasons that were objectively reasonable.

The judgment is affirmed.

In this opinion the other judges concurred.